**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| City of Benton Harbor; Plaintiffs in *Braziel et al. v. City of Benton Harbor et al.*, Case No. 1:21-cv-00960-HYJ-PJG (W.D. Mich.); Plaintiffs in *Braziel et al. v. City of Benton Harbor Water Department et al.*, Case No. 23-0249 (Berrien Cty. Cir. Ct.); Plaintiffs in *A.M. et al. v. City of Benton Harbor et al.*, Case No. 1:22-cv-00475-HYJ-PJG (W.D. Mich.),<br><br>     Plaintiffs,<br>v.<br><br>The Travelers Indemnity Company of Connecticut; The Travelers Indemnity Company; Travelers Property Casualty Company,<br><br>     Defendants. | Case No. 1:25-cv-00861-HYJ-PJG<br><br><br>Hon. Hala Y. Jarbou<br><br><br>**AMENDED COMPLAINT** |

**AMENDED COMPLAINT**

## I.    INTRODUCTION

1.    The City of Benton Harbor purchased and duly paid for a series of insurance policies from the Travelers Indemnity Company of Connecticut, the Travelers Indemnity Company, and Travelers Property Casualty Company (together "Travelers"). The City of Benton Harbor purchased Commercial General Liability ("CGL") policies, Public Entity Management Liability ("PEML") policies, and Umbrella policies for policy years 2017-18 through 2024-25, inclusive (the "Policies" or "Travelers Policies").

2.    Beginning in policy year 2017-18, the City of Benton Harbor experienced lead exceedances and other issues affecting the Benton Harbor water system. Thereafter, the City of Benton Harbor and a number of its individual officers and employees were sued in three civil actions: *Braziel et al. v. City of Benton Harbor et al.*, Case No. 1:21-cv-00960-HYJ-PJG (W.D.

4911-0143-6816_4

Mich.); *Braziel et al. v. City of Benton Harbor Water Department et al.*, Case No. 23-0249 (Berrien Cty. Cir. Ct.); and *A.M. et al. v. City of Benton Harbor et al.*, Case No. 1:22-cv-00475-HYJ-PJG (W.D. Mich.), each of which alleged harm stemming from City of Benton Harbor's response to these issues and management of the water system.

3.      The Policies issued by Travelers cover the City of Benton Harbor's liabilities in these civil actions because the facts alleged in these actions showed that a covered occurrence or wrongful act occurred within the policy period and coverage territory, establishing coverage.

4.      The City of Benton Harbor properly tendered these actions to Travelers in order to obtain defense and indemnification coverage under the policies. However, instead of providing a defense to the City of Benton Harbor subject to a reservation of the right to dispute coverage, Travelers simply denied coverage for both defense and indemnity.

5.      Travelers' refusal to provide a defense to the City of Benton Harbor meant that the City was required to provide its own legal defense, resulting in a significant expenditure of public funds notwithstanding the fact that the City had purchased and paid for insurance policies that provide coverage. The City had already been facing serious financial issues, so this unforeseen expense was devastating for the City.

6.      After engaging in substantial discovery involving hundreds of thousands of pages of documents, numerous depositions, and vigorous arms-length mediation and settlement negotiations—in all of which Travelers had the opportunity to participate—the City of Benton Harbor faced liability exposure well over $25 million in the *Braziel* federal action. Similarly, in the *Mitchell* action, the parties engaged in substantial motion practice which included motions to dismiss, a motion for reconsideration, an appeal to the Sixth Circuit, denial of a petition for rehearing *en banc*, and petition for a writ of certiorari. Based on the disposition of these cases and the promise of substantial future litigation, the City of Benton Harbor reasonably and in good faith

4911-0143-6816_4

agreed to settle the claims against the City for a $25 million consent judgment against the City, alongside various other forms of nonmonetary relief. The settlement with the City resolves the claims in the *Mitchell* action and the *Braziel* federal and state court actions.

7. Travelers is bound by that reasonable, good faith settlement.

8. Moreover, the $25 million consent judgment against the City of Benton Harbor is a result of a bad faith denial of defense coverage by Travelers.

9. For all of these reasons, Travelers is liable to the City for the entirety of the $25 million consent judgment.

10. This action seeks a declaration that:

    a. Travelers owed and continues to owe duties to defend and to indemnify under the Policies;

    b. Travelers is bound by the City's good faith, reasonable settlement of the Benton Harbor Plaintiffs' claims; and

    c. Travelers acted in bad faith when it refused to defend the City and failed to meaningfully participate in settlement discussions to resolve the case within policy limits.

11. This action also seeks damages for Travelers' breaches of contract and bad faith denials of coverage.

## II.    PARTIES

### A.    Plaintiffs

12. **The City of Benton Harbor** ("City") is a body politic and municipal corporation located in western Michigan and authorized by the laws of the State of Michigan. The City purchased CGL, PEML, and Umbrella insurance Policies from Travelers for policy years 2017-18 through 2024-25, inclusive. The City and several of its officers and employees, namely Mayor

4911-0143-6816_4

Marcus Muhammad, former City Manager Darwin Watson, former City Manager Ellis Mitchell, and former Water Plant Director Michael O'Malley, were sued by residents of Benton Harbor for violations of the federal constitutional rights of bodily integrity and to be free from state-created dangers, among other claims. These lawsuits alleged that the City's management of the Benton Harbor water system and subsequent statements to residents caused various forms of harm. Although these lawsuits set forth allegations which constitute "occurrences" and/or "wrongful acts" under the Policies, and theories of liability not subject to exclusions were asserted, Travelers did not tender any legal defense to the City, which severely prejudiced the City and required the City to spend significant time and funds on its own defense.

13.     After years of costly litigation and expert discovery, the City participated in facilitative mediation which resulted in a settlement agreement between the below-described Benton Harbor Plaintiffs and the City. The settlement agreement provided that the City would be held liable under a consent judgment for $25 million. The settlement agreement also included an assignment to the Benton Harbor Plaintiffs of the rights held by the City under the Policies. For this reason, in the instant case, the Benton Harbor Plaintiffs are aligned with the City in pursuit of the City's breach of contract and bad faith claims against Travelers.

14.     **Plaintiffs in *Braziel et al. v. City of Benton Harbor et al.*, Case No. 1:21-cv-00960-HYJ-PJG (W.D. Mich.)** ("*Braziel* federal action") are residents of Benton Harbor who brought claims for declaratory, injunctive, equitable, and monetary relief against the City and a number of its officers and employees, alongside additional defendants, for constitutional and other violations stemming from the City's alleged causation of and response to the Benton Harbor water lead exceedances and other alleged water quality concerns. This action was filed on November 10, 2021. The City tendered this action to Travelers on November 12, 2021. An amended complaint was filed on January 28, 2022. A second amended complaint, which is the operative complaint,

4

was filed on May 20, 2022,[1] which the City tendered to Travelers on May 31, 2022.

15.     The Plaintiffs brought the case on behalf of themselves individually and on behalf of a putative class. The class representatives are Daretha Braziel, individually and as next friend for minor D.R.; Ro'Nesha Braziel; Deanna Braziel; Keesha Jones, individually and as next friend for minors K.B., D.J., T.C., T.M.C; Kendasha Bates; Stacey Branscumb; and Emma Kinnard.

16.     On January 22, 2026, the Court in the *Braziel* federal action granted preliminary approval of the settlement agreement, which included grant of conditional certification of the class for purposes of pursuing the instant action. The settlement class is defined to mean "all individuals who have resided in Benton Harbor for a period of two weeks or more from August 2018 through November 2021, excluding the Individual *Mitchell* Plaintiffs."

17.     **Plaintiffs in *Braziel et al. v. City of Benton Harbor Water Department et al.*, Case No. 23-0249 (Berrien Cty. Cir. Ct.)** ("*Braziel* state action") (together with the *Braziel* federal action "*Braziel* Plaintiffs") are the same residents of Benton Harbor as in the *Braziel* federal action. When certain state law claims were dismissed from the *Braziel* federal action, the *Braziel* Plaintiffs re-filed their state law claims in the Circuit Court for Berrien County. This action was filed on October 30, 2023, and the City tendered this action to Travelers on December 7, 2023.

18.     **Plaintiffs in *A.M. et al. v. City of Benton Harbor et al.*, Case No. 1:22-cv-00475-HYJ-PJG (W.D. Mich.)** ("*Mitchell* action") (collectively "*Mitchell* Plaintiffs") (together with the *Braziel* Plaintiffs "Benton Harbor Plaintiffs") are a group of approximately four hundred and fifty individual minors who, by and through their guardians, together brought claims for monetary relief against the City and a number of its officers and employees, alongside additional defendants, for

---

[1] Leave to amend was granted thereafter, on June 17, 2022, and the Second Amended Complaint was re-filed the same day. The re-filed Second Amended Complaint was tendered on June 23, 2022.

4911-0143-6816_4

the constitutional violations stemming from the City's alleged causation of and response to the Benton Harbor lead exceedances and other alleged water quality concerns.

19.     The *Mitchell* action was filed on May 27, 2022, and the City tendered this action to Travelers on or about June 8, 2022. A full list of the individual *Mitchell* Plaintiffs was filed under seal on the docket to protect the minor Plaintiffs' privacy. *Mitchell et al v. Benton Harbor, City of et al.*, No. 1:22-cv-00475-HYJ-PJG (W.D. Mich.), ECF No. 154. The *Mitchell* Plaintiffs are excluded from the settlement class of the *Braziel* federal and state actions. The *Mitchell* Plaintiffs separately filed for approval of the settlement agreement on February 2, 2026, and the Court granted that approval on February 6, 2026.

### B.     Defendants

20.     **The Travelers Indemnity Company of Connecticut** is an insurance company organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

21.     **The Travelers Indemnity Company** is an insurance company organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

22.     **Travelers Property Casualty Company of America** (collectively "Travelers" with The Travelers Indemnity Company of Connecticut and The Travelers Indemnity Company) is an insurance company organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

23.     Travelers sold Commercial General Liability, Public Entity Management Liability, and Umbrella insurance Policies to the City of Benton Harbor for the policy years 2017-18 through 2024-25, inclusive. After Travelers was properly presented with claims for defense and indemnification by the City for the *Braziel* and *Mitchell* actions, Travelers denied having any duties toward the City with respect to the *Braziel* and *Mitchell* actions and declined to provide any defense

4911-0143-6816_4

to the City.

## III.    JURISDICTION AND VENUE

24.    This Court has personal jurisdiction over Travelers because Travelers sold insurance Policies to the City of Benton Harbor in western Michigan.

25.    This Court has subject matter jurisdiction over this action under the diversity jurisdiction statute, 28 U.S.C. § 1332, because Travelers is a citizen of the State of Connecticut and the City of Benton Harbor and the *Braziel* and *Mitchell* Plaintiffs are citizens of the State of Michigan.

26.    Venue in this Court is proper because Travelers conducted business within this district and the City of Benton Harbor and the *Braziel* and *Mitchell* Plaintiffs are residents of this district.

## IV.    FACTUAL ALLEGATIONS

### A.    Travelers Provides Insurance Coverage to the City

27.    The City of Benton Harbor purchased Commercial General Liability ("CGL") policies, Public Entity Management Liability ("PEML") policies, and Umbrella Policies for policy years 2017-18 through 2024-25, inclusive.[2]

28.    At no point during the City's communications with Travelers regarding the City's insurance coverage did Travelers indicate that there would not be coverage for events like those alleged in the *Braziel* and *Mitchell* actions.

29.    The policies issued by Travelers to the City are set forth in the following table:

| Policy Year | Insurer | Policy | Policy Number |
|---|---|---|---|
| 07.01.17–07.01.18 | Travelers Indemnity Company of Connecticut | Commercial General Liability (CGL) | ZLP-91M82256-17-PB |

---

[2] The Policies are attached as Exhibits 1 through 16.

| Period | Company | Coverage | Policy Number |
|---|---|---|---|
| 07.01.17–07.01.18 | Travelers Indemnity Company of Connecticut | Public Entity Management Liability (PEML) | ZLP-91M82256-17-PB |
| 07.01.17–07.01.18 | Travelers Indemnity Company | Umbrella | ZUP-41M79632-PB |
| | | | |
| 07.01.18–07.01.19 | Travelers Indemnity Company of Connecticut | CGL | ZLP-71N00009-18-PB |
| 07.01.18–07.01.19 | Travelers Indemnity Company of Connecticut | PEML | ZLP-71N00009-18-PB |
| 07.01.18–07.01.19 | Travelers Property Casualty Company of America | Umbrella | ZUP-71N00010-18-PB |
| | | | |
| 07.01.19–07.01.20 | Travelers Indemnity Company of Connecticut | CGL | ZLP-71N00009-19-PB |
| 07.01.19–07.01.20 | Travelers Indemnity Company of Connecticut | PEML | ZLP-71N00009-19-PB |
| 07.01.19–07.01.20 | Travelers Property Casualty Company of America | Umbrella | ZUP-71N00010-19-PB |
| | | | |
| 07.01.20–07.01.21 | Travelers Indemnity Company of Connecticut | CGL | ZLP-71N00009-20-PB |
| 07.01.20–07.01.21 | Travelers Indemnity Company of Connecticut | PEML | ZLP-71N00009-20-PB |
| 07.01.20–07.01.21 | Travelers Property Casualty Company of America | Umbrella | ZUP-71N00010-20-PB |
| | | | |
| 07.01.21–07.01.22 | Travelers Indemnity Company of Connecticut | CGL | ZLP-71N00009-21-PB |
| 07.01.21–07.01.22 | Travelers Indemnity Company of Connecticut | PEML | ZLP-71N00009-21-PB |
| 07.01.21–07.01.22 | Travelers Property Casualty Company of America | Umbrella | ZUP-71N00010-21-PB |
| | | | |
| 07.01.22–07.01.23 | Travelers Indemnity Company of Connecticut | CGL | ZLP-71N00009-22-PB |
| 07.01.22–07.01.23 | Travelers Indemnity Company of Connecticut | PEML | ZLP-71N00009-22-PB |
| 07.01.22–07.01.23 | Travelers Property Casualty Company of America | Umbrella | ZUP-71N00010-22-PB |
| | | | |

4911-0143-6816_4

| 07.01.23–07.01.24 | Travelers Indemnity Company of CT | CGL | ZLP-71N00009-23-PB |
| 07.01.23–07.01.24 | Travelers Indemnity Company of Connecticut | PEML | ZLP-71N00009-23-PB |
| 07.01.23–07.01.24 | Travelers Property Casualty Company of America | Umbrella | ZUP-71N00010-23-PB |
| | | | |
| 07.01.24–07.01.25 | Travelers Property Casualty Company of America | CGL | ZLP-71N00009-24-PB |
| 07.01.24–07.01.25 | Travelers Indemnity Company of Connecticut | PEML | ZLP-71N00009-24-PB |
| 07.01.24–07.01.25 | Travelers Property Casualty Company of America | Umbrella | ZUP-71N00010-24-PB |

30.     The Travelers Policies listed above constitute valid and enforceable written contracts between Travelers and the City.

31.     The Travelers Policies require Travelers to defend and indemnify the City with respect to the *Braziel* and *Mitchell* actions.

32.     Accordingly, the Travelers Policies obligate Travelers to pay all defense costs and expenses, including attorneys' fees, incurred by the City to defend the *Braziel* and *Mitchell* actions.

33.     Travelers has denied any defense obligation for the *Braziel* and *Mitchell* actions, and has not reimbursed the City for any costs and expenses incurred by the City. Travelers has also denied any indemnity obligation for the *Braziel* and *Mitchell* actions.

34.     The City paid substantial premiums to Travelers for the Travelers Policies. The City timely and fully paid all premiums due under each policy.

35.     The City fulfilled all of its obligations and complied with all policy provisions and has fully performed, or is excused from performing, all of the applicable terms and conditions of each of the Travelers Policies, including but not limited to providing notice.

/ / /

9

4911-0143-6816_4

**B.      Allegations Related to the Benton Harbor Lead Exceedances and Other**

**Alleged Water Quality Concerns**

36.      The following paragraphs 37 to 63, inclusive, describe factual allegations set forth in the *Braziel* and *Mitchell* actions, of which Travelers was aware. These paragraphs do not constitute admissions by the City of the underlying factual content stated therein. More fulsome factual allegations may be found in the Complaints filed in the *Mitchell* and *Braziel* actions, which are incorporated by reference.

37.      From 2016 to 2020 there were approximately 9,600 residents in Benton Harbor. Approximately 85% are African American and 5% are Hispanic, and approximately 27% are minors.

38.      Benton Harbor has struggled financially for many years. Due to budget deficits and other financial issues, the City was placed under the control of two consecutive Emergency Managers from 2010 to 2014. From 2014 to July 2016, the City was placed under the control of the Benton Harbor Receivership Transition Advisory Board.

39.      Benton Harbor's public water system is owned and managed by the City of Benton Harbor.

40.      The Benton Harbor public water system sources its water from Lake Michigan. The source water may corrode metals over time if not properly managed with corrosion control treatment.

41.      The Lead and Copper Rule of the Safe Drinking Water Act ("SDWA"), 40 C.F.R. § 141, and the Michigan Safe Drinking Water Act ("MSDWA") impose duties on the City with respect to the maintenance and operation of the Benton Harbor public water system, as well as public notification to residents should certain problems occur. Actions, including corrosion control and public notification, must be taken when sampling shows that an Action Level Exceedance

10

4911-0143-6816_4

("ALE") has occurred. For lead, the Action Level was 15 parts per billion ("ppb") as of 2018.

42.    Water samples from taps at various locations in the Benton Harbor water system were taken in a sampling period beginning June 1, 2018, and ending September 30, 2018. The 90th percentile of the sample results for this sampling period showed lead at 22 ppb, with eight sample sites above the Action Level. This sample thus constituted the first ALE in Benton Harbor.

43.    On October 3, 2018, the State of Michigan issued a Significant Deficiency Violation Notice to the City alleging certain violations of the SDWA and related administrative rules, stemming from staffing and funding concerns, and including certain monitoring and treatment deficiencies. The City and the State entered into an Administrative Consent Order that set forth certain requirements including distributions of a public advisory and educational materials and proposing a corrosion control treatment plan or study.

44.    On October 11, 2018, the City distributed a public advisory letter to Benton Harbor residents. This advisory letter allegedly did not instruct residents not to drink the water nor inform them that the water was not safe to drink, as required by the SDWA and MSDWA. Instead, the advisory letter gave inadequate precautions which were not sufficient to prevent lead exposure, such as to run the water for several minutes before drinking and to use cold tap water for drinking and cooking.

45.    The ALE for the sampling period ending September 30, 2018, was the first of six consecutive ALEs to occur in Benton Harbor. The following table summarizes the sampling periods which resulted in ALEs:

| Sampling Period | 90th Percentile (in parts per billion) | Number of Sites Above Action Level | Range of Sample Results (in parts per billion) |
|---|---|---|---|
| 6/1/2018 - 9/30/2018 | 22 | 8 | 0-60 |
| 1/1/2019 - 6/30/2019 | 27 | 12 | 0-59 |
| 7/1/2019 - 12/31/2019 | 32 | 10 | 0-72 |
| 1/1/2020 - 6/30/2020 | 26 | 9 | 0-440 |

11

4911-0143-6816_4

| 7/1/2020 - 12/31/2020 | 24 | 11 | 0-240 |
| 1/1/2021 - 6/30/2021 | 24 | 11 | 0-889 |

46.     Plaintiffs have also alleged that the City experienced other problems with the water system, including bacterial contamination. *See generally* ECF No. 1-1.

47.     In a Regulatory Status Update dated January 23, 2019, the City allegedly admitted that the Benton Harbor water system's chlorine feed was located at the wrong state of the water treatment process. Since chlorine treatment destroys harmful bacteria in the water, this issue impacted the ability to remove harmful bacteria from the water. Moreover, the chlorine analyzer was not functional, further impacting the ability of the water system to remove harmful bacteria from the water. These issues would later be memorialized by the U.S. Environmental Protection Agency ("EPA") in an Inspection Report dated March 29, 2022.

48.     Following the ALE in the fall of 2018 and the bacterial issues in early 2019, the City and its officials and employees allegedly did not warn residents or respond appropriately to reverse or mitigate the proliferation of lead and bacteria. Instead, they acted in a manner which the *Braziel* and *Mitchell* Plaintiffs alleged "shocked the conscience" and violated their constitutional rights to bodily integrity and to be free from state-created dangers.

49.     Water Plant Director Michael O'Malley, a City employee, had a duty to direct a corrosion control study to determine an appropriate corrosion control strategy. Instead of fulfilling this duty, O'Malley allegedly grossly mismanaged the water system and the City's response to the ALEs.

50.     O'Malley introduced a generic polyphosphate blend called Carus 8600 to the water system. With the professional expertise he would reasonably have had, O'Malley allegedly should have known that a polyphosphate blend would not reduce the corrosive effect of the water flowing within metal (lead, copper, iron) pipes, and may exacerbate the presence of bacteria in the water.

12

Moreover, O'Malley should have known that any phosphate blend would require testing and tailoring to the particular system.

51.     O'Malley allegedly selected Elhorn Engineering as a contractor to assist with the City's water issues. However, Elhorn Engineering had a clear conflict of interest because Elhorn Engineering sold and profited from Carus 8600, therefore the recommendation to use Carus 8600 should have been more closely examined by O'Malley. Instead, he introduced the untested product into the water system.

52.     O'Malley and Elhorn Engineering also allegedly designed an improper and insufficient corrosion control study after they had already introduced the corrosion control blend into the system, which did not comply with the Lead and Copper Rule of the SDWA and EPA guidance.

53.     According to the *Braziel* and *Mitchell* actions, O'Malley and other City officers and employees failed to take responsibility for the foregoing events.

54.     On January 13, 2019, the City of Benton Harbor alongside the Berrien County Health Department issued a joint press release scheduling a Town Hall public meeting to discuss the October 2018 drinking water samples which resulted in an ALE. According to the *Braziel* and *Mitchell* actions, at this meeting, in violation of state law, Benton Harbor residents were not informed that the tap water was unsafe to drink or ingest. Instead, residents were told to run the water for 5 minutes before use and to place water filters on their faucets, even though neither of these measures is sufficient to protect against the corrosive effects of improperly treated water, including lead and bacterial harms.

55.     An email dated January 9, 2019, from a Benton Harbor resident to the State of Michigan Department of Environment, Great Lakes & Energy ("EGLE") Director Eric Oswald stated that O'Malley had told her that even in homes that tested above the 15 ppb limit for lead,

13

after the "first flush it was okay to drink and cook" because "they [the Benton Harbor water department] provide clean water right to their spout."

56.     From 2019 through 2021, O'Malley, Mayor Muhammad, and other City officers and employees allegedly continued to make false and misleading statements to Benton Harbor residents that the water was safe for use.

57.     O'Malley allegedly refused to disclose the addresses of the water sampling sites to EGLE. O'Malley was fired in 2020 for submitting false water department documents, including documents relating to chlorine analysis and control.

58.     City officers and employees also allegedly obscured the state of bacterial proliferation in the water system. A March 29, 2022 Inspection Report by the EPA showed that chlorine levels would spike and drop at certain times of day. Benton Harbor officials stated that the chlorine feed was only being run during the water plant's hours of operation. Not only did this mean that chlorine was not being distributed in the evening and overnight, it created the appearance that chlorine levels were generally normal when they were not.

59.     Written materials distributed during that time were also allegedly insufficient and mismanaged. For example, as memorialized in a January 26, 2021, email between EGLE employees Ernie Sarkipato and Brandon Onan, a public education notice sent in August 2020 "and likely other public notices" were "likely not sent to all residences."

60.     The EPA catalogued a list of various claimed statutory and regulatory violations of the Benton Harbor water system in an inspection report dated October 27, 2021. This report noted records maintenance violations, disinfection violations, Total Coliform Rule monitoring violations (which relate to bacteria), monitoring equipment violations, and treatment violations, among other issues.

61.     The EPA also allegedly cited the City for its public education violations in a

14

Unilateral Administrative Order dated November 2, 2021. This Order noted that City officials had failed to notify schools, hospitals, clinics, and welfare agencies of the ALEs; failed to send public education materials to water system customers through the mail during the 12-month period from August 2020 to August 2021; and failed to provide information of the high levels of lead in the 12-month period from August 2020 to August 2021, in violation of the Lead and Copper Rule of the SDWA, among other violations.

62.     It was not until Michigan Governor Gretchen Whitmer made a public emergency announcement in October 2021 that Benton Harbor residents were finally told that the water was not safe to drink.

63.     The *Braziel* and *Mitchell* actions alleged that the statutory, regulatory, and constitutional violations of the City and its officers and employees harmed the Benton Harbor Plaintiffs in a wide variety of ways, including forms of damages not subject to exclusions, such as, without limitation:

    a.  Deprivation of Constitutional rights without due process.

    b.  Deprivation of statutory and regulatory rights under the SDWA and MSDWA.

    c.  Violation of the right to bodily integrity.

    d.  Exposure to lead, bacteria, and other forces requiring medical monitoring and, in some instances, medical treatment.

    e.  Developmental disabilities causing lost future earnings and emotional distress, among other issues.

    f.  Economic loss as a result of paying for water which was not fit for ordinary use and therefore valueless.

    g.  Diminution of property value.

**C.     The Policies Include Coverage for Liability Related to the Benton**

15

4911-0143-6816_4

**Harbor Lead Exceedances and Other Alleged Water Quality Concerns.**

64.     Having purchased and paid premiums for CGL, PEML, and Umbrella Policies, the City reasonably understood that coverage for liability stemming from events such as the Benton Harbor water lead exceedances and other alleged water quality concerns was what the City had bargained and paid for.

65.     As described below, coverage for liabilities stemming from these events is required because the City incurred damages and losses related to alleged occurrences or wrongful acts, as applicable, within the coverage territory and during the policy periods.

### 1.     Commercial General Liability (CGL)

66.     Each of the CGL Policies purchased by the City from Travelers for the policy years 2017-18 to 2024-25, inclusive, contain the same or substantially the same language regarding coverage.

67.     "Coverage A" of the CGL policies is for "bodily injury and property damage liability." In the Insuring Agreement for this coverage, Travelers states that it "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."

68.     The Insuring Agreement further states that Travelers "will have the right and duty to defend the insured against any 'suit' seeking those damages."

69.     The Insuring Agreement further states that coverage will only apply if the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory" and during the policy period.

70.     "Occurrence" is defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

71.     The "coverage territory" is defined to mean "the United States of America[.]"

4911-0143-6816_4

72.    The Benton Harbor lead exceedances and other alleged water quality concerns described above constitute "occurrences" because they are accidents.

73.    The "occurrences" of the Benton Harbor lead exceedances and other alleged water quality concerns occurred within the United States of America and therefore within the "coverage territory."

74.    The alleged injuries caused by the "occurrences" of the Benton Harbor lead exceedances and other alleged water quality concerns occurred during the policy periods for, at minimum, the five policy years spanning from 2017-18 through 2021-22, inclusive.

75.    The policy year 2017-18 started on July 1, 2017, and ended on July 1, 2018. The first ALE was demonstrated from sampling which began on June 1, 2018. Therefore, alleged "occurrences" began during the 2017-2018 policy year.

76.    The policy year 2021-22 started on July 1, 2021, and ended on July 1, 2022. Alleged damages occurred at least through Governor Whitmer's announcement in October 2021 that the water was not safe to drink. Therefore, alleged "occurrences" continued at least into the 2021-2022 policy year.

77.    The alleged "occurrences" of the Benton Harbor lead exceedances and other water quality concerns caused "bodily injury," "property damage," and/or other damage.

78.    The *Braziel* and *Mitchell* actions were "suits" seeking damages for "bodily injury" and "property damage" caused by the "occurrences" of the Benton Harbor lead exceedances and other alleged water quality concerns.

79.    The City timely placed Travelers on notice of the suits and complied with all reporting requirements.

80.    The *Braziel* and *Mitchell* actions set forth theories of liability and damages that are not excluded by any applicable exclusion, including, without limitation:

17

a.   Deprivation of Constitutional rights without due process.

b.   Deprivation of statutory and regulatory rights under the SDWA and MSDWA.

c.   Violation of the right to bodily integrity.

d.   Exposure to lead, bacteria, and other forces requiring medical monitoring and, in some instances, medical treatment.

e.   Developmental disabilities causing lost future earnings and emotional distress, among other issues.

f.   Economic loss as a result of paying for water which was not fit for ordinary use and therefore valueless.

g.   Diminution in property value.

81.   Because the City incurred damages as a result of the alleged "bodily injury" and "property damage" caused by the "occurrences" of the Benton Harbor lead exceedances and other alleged water quality concerns during the coverage period and in the coverage territory, Travelers owed and continues to owe duties to defend and indemnify the City under the CGL Policies.

**2.   Public Entity Management Liability (PEML)**

82.   Each of the PEML Policies purchased by the City from Travelers for the policy years 2017-18 to 2024-25, inclusive, contain the same or substantially the same language regarding coverage.

83.   In the Insuring Agreement for the Public Entity Management Liability coverage, Travelers states that it "will pay those sums that the insured becomes legally obligated to pay as damages because of loss to which this insurance applies."

84.   The Insuring Agreement further states that Travelers "will have the right and duty to defend the insured against any 'suit' seeking those damages."

85.   The Insuring Agreement further states that the insurance applies where the loss is:

18

4911-0143-6816_4

(1) caused by a "wrongful act"; (2) committed in the "coverage territory"; (3) not committed before the "Retroactive Date" or after the end of the policy period; and (4) a claim or "suit" that seeks damages because of the loss is made or brought during the policy period …."

86.    "Wrongful act" is defined to mean "any act, error or omission."

87.    The "coverage territory" is defined to mean "The United States of America[.]"

88.    The "Retroactive Date" is listed in the Declarations Page for each policy and is October 1 of the year ten (10) years before the last calendar year of the policy year.

89.    The policies provide that "A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for 90 days."

90.    The events alleged in the Benton Harbor water litigation described above were "wrongful acts" because they were "acts, errors, or omissions," meaning they were actions which breached constitutional, statutory, and regulatory duties and the common law duty of care by the City.

91.    The "wrongful acts" alleged in the Benton Harbor litigation occurred within the United States of America and therefore within the "coverage territory."

92.    The losses caused by the alleged "wrongful acts" described in the Benton Harbor water litigation occurred during the policy periods for, at minimum, the five policy years spanning from 2017-18 through 2021-22, inclusive.

93.    The policy year 2017-18 started on July 1, 2017, and ended on July 1, 2018. The first ALE was based on sampling which began on June 1, 2018. Therefore, "wrongful acts" began during the 2017-2018 policy year.

94.    The policy year 2021-22 started on July 1, 2021, and ended on July 1, 2022. Alleged damages occurred at least through Governor Whitmer's announcement in October 2021 that the

19

water was not safe to drink. Therefore, the alleged "wrongful acts" continued at least into the 2021-2022 policy year.

95.     The alleged "wrongful acts" of the Benton Harbor lead exceedances and other alleged water quality concerns occurred after the Retroactive Date for the 2021-2022 policy year, which was October 1, 2012.

96.     The *Braziel* federal action was filed on November 10, 2021, and the *Mitchell* action was filed on May 27, 2022. Therefore, a "suit" was brought within the 2021-2022 policy period.

97.     Plaintiffs allege that the "wrongful acts" described above caused losses.

98.     The *Braziel* and *Mitchell* actions were "suits" seeking damages for losses caused by the "wrongful acts" of the Benton Harbor lead exceedances and other alleged water quality concerns.

99.     The City timely placed Travelers on notice of the suits and complied with all reporting requirements.

100.    The *Braziel* and *Mitchell* actions set forth theories of liability and damages that are within the PEML coverage grants, and not otherwise excluded, including, without limitation:

    a.    Deprivation of Constitutional rights without due process.

    b.    Deprivation of statutory and regulatory rights under the SDWA and MSDWA.

    c.    Violation of the right to bodily integrity.

    d.    Exposure to lead, bacteria, and other forces requiring medical monitoring and, in some instances, medical treatment.

    e.    Developmental disabilities causing lost future earnings and emotional distress, among other issues.

    f.    Economic loss as a result of paying for water which was not fit for ordinary use and therefore valueless.

20

g.   Diminution in property value.

101.   Because the City incurred legal liability for losses due to the alleged "wrongful acts" committed during the coverage period and within the coverage territory, and for which a "suit" was brought during the coverage period, Travelers owed and continues to owe duties to defend and to indemnify the City under the PEML Policies.

### 3.   Umbrella Policies

102.   The City purchased the Umbrella Policies which provided umbrella coverage over both its CGL and PEML policies. In general, the Umbrella Policies provide additional limits in case covered damages or losses exceed the policy limits of the CGL or PEML Policies.

103.   The Umbrella Policies corresponding to the CGL Policies for policy years 2017-18 and 2018-19 contain distinct language from the subsequent policy years.

### a.   CGL Umbrella: 2017-18 and 2018-19

104.   In the Insuring Agreement for the CGL Umbrella Policies for policy years 2017-18 and 2018-19, Travelers states that it "will pay on behalf of the insured the 'ultimate net loss' in excess of the 'applicable underlying limit' which the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage', 'personal injury' or 'advertising injury' to which this insurance applies."

105.   The Insuring Agreement states that it applies to "bodily injury" and "property damage" only if the "bodily injury" or "property damage" is caused by an "occurrence" that "takes place anywhere in the world" and the "bodily injury" or "property damage" occurs during the policy period.

106.   The Insuring Agreement further states that "damages from bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury."

21

4911-0143-6816_4

107.    The Insuring Agreement further states that "Property damage that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the occurrence that caused it."

108.    The Insuring Agreement further states that Travelers "will have the right and duty to defend any 'suit' for damages which are payable under [the policy coverages] (including damages wholly or partly within the 'retained limit') but which are not payable by a policy of 'underlying insurance', or any other available insurance, because: (1) Such damages are not covered; or (2) The 'underlying insurance' has been exhausted by the payment of claims."

109.    As set forth above, the City was faced with "suits" for damages for the Benton Harbor lead exceedances and other water quality concerns, which constituted "occurrences" that took place with the coverage territory and during the policy years 2017-18 and 2019-19 which allegedly caused "bodily injury" and "property damage."

110.    The *Braziel* and *Mitchell* actions set forth theories of liability and damages that are within the Travelers Policies' coverage grants, and not otherwise excluded, including, without limitation:

a.  Deprivation of Constitutional rights without due process.

b.  Deprivation of statutory and regulatory rights under the SDWA and MSDWA.

c.  Violation of the right to bodily integrity.

d.  Exposure to lead, bacteria, and other forces requiring medical monitoring and, in some instances, medical treatment.

e.  Developmental disabilities causing lost future earnings and emotional distress, among other issues.

f.  Economic loss as a result of paying for water which was not fit for ordinary use and therefore valueless.

4911-0143-6816_4

g.   Diminution in property value.

111.   Due to the magnitude of the City's potential liability, the underlying CGL insurance would be exhausted by the payment of the claims set forth in the *Braziel* and *Mitchell* actions. Therefore, Travelers owed and continues to owe duties to defend and indemnify under the CGL Umbrella Policies for policy years 2017-18 and 2018-19.

**b.      CGL Umbrella: 2019-20 to 2024-25**

112.   The CGL Umbrella Policies for policy years 2019-20 to 2024-25, inclusive, contain the same or substantially the same language regarding coverage.

113.   These CGL Umbrella Policies follow the form of the underlying CGL policies, meaning that the CGL Umbrella policies provide coverage if the underlying CGL policies provide coverage and the policy limits of the underlying CGL policies are exhausted.

114.   As set forth above, coverage for the *Braziel* and *Mitchell* actions exists under the CGL policies for at least policy years 2019-20 through 2021-22, inclusive. The CGL Umbrella Policies for these periods therefore also provide coverage. Due to the magnitude of the City's potential liability, the underlying CGL insurance would be exhausted by the payment of the claims set forth in the *Braziel* and *Mitchell* actions. Therefore, Travelers owed and continues to owe duties to defend and indemnify under the CGL Umbrella Policies for at least policy years 2019-20 through 2021-22, inclusive.

**c.      PEML Umbrella**

115.   The PEML Umbrella Policies for policy years 2017-18 to 2024-25, inclusive, contain the same or substantially the same language regarding coverage.

116.   These PEML Umbrella Policies follow the form of the underlying PEML policies, meaning that the PEML Umbrella policies provide coverage if the underlying PEML policies provide coverage and the policy limits of the underlying PEML policies are exhausted.

4911-0143-6816_4

117.    As set forth above, coverage for the *Braziel* and *Mitchell* actions exists under the PEML Policies for at least policy year 2021-22.

118.    Due to the magnitude of the City's potential liability, the underlying CGL insurance would be exhausted by the payment of the claims set forth in the *Braziel* and *Mitchell* actions. Therefore, Travelers owed and continues to owe duties to defend and indemnify under the PEML Umbrella Policy for at least policy year 2021-22.

**D.      Travelers Refuses to Fulfill Its Obligations to Defend and Indemnify**

119.    The *Braziel* federal action was filed on November 10, 2021, the *Braziel* state action was filed on October 30, 2023, and the *Mitchell* action was filed on May 27, 2022.

120.    The City tendered the *Braziel* federal action to Travelers on November 12, 2021, tendered the *Braziel* state action to Travelers on December 7, 2023, and tendered the *Mitchell* action to Travelers on or about June 8, 2022.

121.    Even though covered theories of liability and damages were asserted against the City by the *Mitchell* and *Braziel* Plaintiffs, Travelers denied coverage and refused to defend or indemnify the City.

122.    By refusing to provide a defense in contravention of its contractual obligations under the Policies, Travelers is bound by any reasonable, good faith settlement entered into by the City, regardless of whether Travelers consented to the settlement.

123.    Because of Travelers' breach of its duty to defend, the City was forced to fund its own legal defense. This was a devastating expense for the City, which has a limited budget and a history of financial distress.

124.    Throughout the course of the litigation, the *Braziel* and *Mitchell* Plaintiffs presented evidence and of the various forms of damages and losses they suffered. These damages and losses included forms of damages not subject to exclusions, such as, without limitation:

a.  Deprivation of Constitutional rights without due process.

b.  Deprivation of statutory and regulatory rights under the SDWA and MSDWA.

c.  Violation of the right to bodily integrity.

d.  Exposure to lead, bacteria, and other forces requiring medical monitoring and, in some instances, medical treatment.

e.  Developmental disabilities causing lost future earnings and emotional distress, among other issues.

f.  Economic loss as a result of paying for water which was not fit for ordinary use and therefore valueless.

g.  Diminution of property value.

125.    Expert reports and other evidence set forth the City's potential liabilities as being in excess of $25 million in the *Braziel* action alone.

126.    Faced with the likelihood of crushing liability as well as ongoing legal expenses, the City mediated the suits.

127.    The City gave Travelers notice of the mediation and provided it with an opportunity to meaningfully participate.

128.    Travelers attended the mediation but did not meaningfully participate or contribute to a settlement because it continued to assert that it had no duty to defend or indemnify the City.

129.    The *Mitchell* and *Braziel* Plaintiffs made demands to resolve the dispute at or below policy limits.  The *Mitchell* Plaintiffs tendered their demand letter on August 14, 2025.

130.    The City tendered those demands on August 15 and 18, 2025 to Travelers, which continued to deny any duty to defend or indemnify.

131.    Leaving the City on its own to defend against the Benton Harbor Plaintiffs' suits and to bear all of the risk of being subjected to multiple judgments against them in excess of $25

25

million, the City vigorously negotiated at mediation.

132.    Ultimately, the City and the Plaintiffs entered into a good faith, reasonable settlement agreement under which the City would be liable for a consent judgment of $25 million and provide various forms of non-monetary relief.

133.    The Court invited Travelers to appear at the *Braziel* plaintiffs' motion for approval of class certification and the settlement, providing Travelers with actual notice of the matter, to the extent it did not have actual notice beforehand.

134.    In addition, Travelers was on constructive notice of the pending settlement, along with all other developments, because motions for preliminary approval of the settlement were publicly filed in the *Braziel* and *Mitchell* actions, and Travelers was in possession of the case information for those actions.

135.    Thereafter, the *Mitchell* Plaintiffs filed a motion to approval of the Plaintiffs' settlement with the City. Travelers was on constructive notice of the pending settlement because motions for preliminary approval of the settlement were publicly filed in the *Braziel* and *Mitchell* actions, which dockets were consolidated by the Court.

## COUNT I

## DECLARATORY JUDGMENT: MCR 2.605

136.    All preceding allegations are incorporated by reference as if re-stated herein.

137.    Travelers owes duties of defense and indemnification to the City under the CGL, PEML, and Umbrella Policies, as described above, with respect to the *Braziel* and *Mitchell* actions.

138.    Despite the fact that the *Braziel* and *Michell* actions set forth theories of liability and damages covered under the Policies, Travelers denied having any duty to defend or indemnify the City.

139.    An actual controversy exists between Travelers and the City and the *Braziel* and

26

4911-0143-6816_4

*Mitchell* Plaintiffs with respect to the rights and duties set forth in the Policies.

140. Because of Travelers' denials of its duties to defend and indemnify the City with respect to the events of the Benton Harbor lead exceedances and other alleged water quality concerns, the City faced and continues to face massive legal defense costs and is liable under the consent judgment entered and approved in the *Braziel* and *Mitchell* actions.

141. The dispute between Travelers and the City and the *Braziel* and *Mitchell* Plaintiff is real, concrete, and ripe for adjudication, and a declaration is necessary to guide the parties' conduct and resolve uncertainty.

142. Therefore, the City and the *Braziel* and *Mitchell* Plaintiffs request entry of an order declaring that:

    a. Travelers owed and continues owe a duty to defend the City for the *Braziel* and *Mitchell* actions under the Travelers Policies, or some of them;

    b. Travelers owes a duty to indemnify the City for the *Braziel* and *Mitchell* settlements, once finalized, under the Travelers Policies, or some of them.

    c. Travelers is bound by the City's good faith, reasonable settlement of the Benton Harbor Plaintiffs' claims;

    d. Travelers breached its duty to defend the City; and

    e. Travelers breached its duty to settling by refusing to resolve the *Braziel* and *Mitchell* actions within the limits of the Policies, despite opportunities to do so.

**COUNT II**

**BREACH OF CONTRACT: DUTY TO DEFEND**

143. All preceding allegations are incorporated by reference as if re-stated herein.

144. The CGL, PEML, and Umbrella Policies were valid and enforceable contracts between the City and Travelers.

27

145. A material term of the Travelers Policies is that Travelers owes a duty to defend the City in the event the City is sued for potentially covered damages or losses.

146. The City duly paid monetary policy premiums as consideration for this material term.

147. As described above, the *Braziel* and *Mitchell* actions set forth theories of liability against the City which were, at minimum, potentially covered under the Policies.

148. The City timely notified Travelers of the *Braziel* and *Mitchell* actions, and of the mediation and settlement which occurred in those actions. The City fulfilled all its obligations pursuant to the Travelers Policies, or was excused from performance.

149. Under Michigan law, the duty to defend is broad and applies when a lawsuit sets forth a theory of liability which is even arguably covered by an insurance policy.

150. Travelers owed a duty to provide a defense to the City with respect to the *Braziel* and *Mitchell* actions.

151. Travelers breached its duty to defend the City with respect to the *Braziel* and *Mitchell* actions by affirmatively disclaiming the duty and leaving the City to fund its own legal defense.

152. Travelers' breach of duty caused damages to the City in the form of years of significant legal defense costs, the $25 million consent judgment against the City which has been preliminarily approved in the *Braziel* and *Mitchell* actions, and other consequential damages.

**COUNT III**

**BREACH OF CONTRACT: DUTY TO INDEMNIFY**

153. All preceding allegations are incorporated by reference as if re-stated herein.

154. The CGL, PEML, and Umbrella Policies were valid and enforceable contracts between the City and Travelers.

28

155.    A material term of the Policies is that Travelers owes a duty to indemnify the City in the event the City becomes liable for covered damages or losses.

156.    The City duly paid monetary policy premiums as consideration for this material term.

157.    As described above, the *Braziel* and *Mitchell* actions set forth theories of liability against the City which were covered under the Policies.

158.    The City timely notified Travelers of the *Braziel* and *Mitchell* actions, and of the mediation and settlement which occurred in those actions. The City fulfilled its duties to obtain coverage under the Policies.

159.    Moreover, policy limits demands for the Travelers Policies were tendered to Travelers during the mediation process.

160.    Travelers owed a duty to provide indemnity to the City with respect to the *Braziel* and *Mitchell* actions.

161.    Travelers breached its duty to indemnify the City with respect to the *Braziel* and *Mitchell* actions by affirmatively disclaiming coverage and leaving the City to face liability and judgment.

162.    Travelers' breach of duty caused damages to the City in the form of the $25 million consent judgment against the City which has been preliminarily approved in the *Braziel* and *Mitchell* actions, as well as other consequential damages.

## COUNT IV

## BAD FAITH

163.    All preceding allegations are incorporated by reference as if re-stated herein.

164.    Travelers' refusal to defend Travelers and settle the *Braziel* and *Mitchell* actions within policy limits under the circumstances alleged herein was arbitrary, indifferent, and/or in

29

intentional disregard of the interests of the City.

165.    Travelers' conduct was motivated by selfish purpose and its desire to protect its own interests and not the interests of its insured—the City—in violation of the Policies.

166.    The City and its agents faced substantial legal and financial risk in excess of policy limits as a result of the suits brought by the Benton Harbor Plaintiffs, which asserted theories of liability that fall within the coverage established by the Travelers Policies.

167.    Likewise, despite that risk to the City, Travelers refused to engage in good faith settlement discussions to resolve the case within Policy limits by, among other things:

    a.    Refusing to solicit or initiate settlement offers from the Benton Harbor Plaintiffs;

    b.    Refusing to meaningfully and in good faith participate in mediation to resolve the *Braziel* and *Mitchell* actions within policy limits;

    c.    Refusing to make a proper investigation of the claim prior to refusing offers to resolve the case within policy limits or otherwise participate in mediation to resolve the *Braziel* and *Mitchell* actions within policy limits;

    d.    Refusing to fairly consider a compromise and facts presented and pass honest judgment thereon; and

    e.     Acting with indifference to the effect that its refusal to defend and settle the *Braziel* and *Mitchell* actions would have on the City.

168.    As a result of Traveler's bad faith conduct, the City incurred all fees and costs associated with its vigorous defense of the suits and has incurred liability under a reasonable, good faith settlement agreement with the *Mitchell* and *Braziel* Plaintiffs, which includes provision for entry of a consent judgment for $25 million.

169.    Travelers is bound by the reasonable, good faith settlement agreement and consent judgment as a result of Travelers' wrongful refusal to defend the City and its bad faith refusal to

4911-0143-6816_4

defend the City and settle the suits within Policy limits.

170.  Therefore, the City and the *Braziel* and *Mitchell* Plaintiffs request that the Court find that Travelers acted in bad faith  and otherwise award the following relief:

    a.  Declare that Travelers is bound by and liable for the agreed-upon consent judgment and settlement agreement;

    b.  Declare Travelers acted in bad faith by refusing to defend the City and meaningfully engage in settlement to resolve the suits within policy limits;

    c.  Declare that Travelers breached its duty to defend and indemnify the City; and

    d.  Award attorneys' fees and costs to defend the suits, attorneys' fees and costs for prosecuting this matter, as well as penalty interest under MCL 500.2006(1).

## PRAYER FOR RELIEF

171.  Wherefore, Plaintiffs request the following relief:

    a.  Declaratory judgments as set forth herein.

    b.  Monetary damages including, without limitation:

        i.   The $25 million consent judgment against the City.

        ii.  The full cost of the City's legal defense in the *Braziel* and *Mitchell* actions, including, without limitation, attorneys' fees, expert costs, and case costs.

        iii. Other consequential damages as provided by law.

        iv.  Statutory interest under MCL 500.2006 and any other interest or penalties provided by law.

    c.  Attorneys' fees and costs as provided by law.

    d.  Other legal and equitable relief as the Court deems necessary.

## JURY DEMAND

172.  Plaintiffs demand a trial by jury.

4911-0143-6816_4

Dated: February 18, 2026          Respectfully submitted,

By: /s/ Donovan S. Asmar
      Michael G. Costello (P38008)
      Donovan S. Asmar (P77951)
      201 W. Big Beaver Rd., Suite 500
      Troy, MI 48084
      (248) 743-6000
      mcostello@bodmanlaw.com
      dasmar@bodmanlaw.com
      *Attorneys for Plaintiff*

4911-0143-6816_4